# In the United States Court of Federal Claims

No. 19-1947
(Filed:  12 May 2020[*])

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| SSI TECHNOLOGY, INC., | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant, | * |
| | * |
| and | * |
| | * |
| FISCHER PANDA GENERATORS, | * |
| | * |
| Defendant-Intervenor. | * |
| | * |

Pre-award bid protest; FAR 6.302-2;
unusual and compelling urgency;
10 U.S.C. § 2304(c)(2); sole source
procurement.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Bret S. Wacker*, of Clark Hill PLC, of Detroit, MI, for plaintiff.

*Delisa M. Sanchez*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Steven J. Gillingham*, Assistant Director, all of Washington, DC, for defendant.

*Frank V. Reilly*, of Fort Lauderdale, FL, for defendant-intervenor.

## OPINION AND ORDER

**HOLTE, Judge**.

In this pre-award bid protest, plaintiff, SSI Technology, Inc. ("plaintiff" or "SSI") challenges the Army's Solicitation No. W56HZV-19-R-0050 to award a firm fixed price sole source contract to intervenor, Fischer Panda Generators ("Fischer Panda"), for the production of Auxiliary Power Units ("APUs"), which power M88A1/A2 Recovery Vehicles (essentially an

---

[*] This opinion was originally filed under seal on 6 May 2020 pursuant to the protective order in this case. The Court provided the parties six days to review this opinion for any proprietary, confidential, or other protected information, and submit to the Court proposed redactions, if any, before the opinion is released for publication. The parties jointly proposed minimal redactions. The Court accepts the parties' redactions, with redacted language replaced as follows: [XXX].

armored tank with a crane boom).  Pending before the Court are plaintiff's and the government's cross-motions for judgment on the administrative record and plaintiff's application for a temporary restraining order and motion for a preliminary injunction.  For the following reasons, the Court:  (1) **DENIES** plaintiff's motion for judgment on the administrative record; (2) **GRANTS** the government's cross-motion for judgment on the administrative record; and (3) **DENIES AS MOOT** plaintiff's application for temporary restraining order and motion for preliminary injunction.

## I.  Background

### A.  Prior Procurement History

Minowitz Manufacturing Company ("Minowitz") was the original equipment manufacturer ("OEM") of the APUs at issue in this case, and "was the only known supplier for APU spares requirements."[1]  Admin. R. at 836, ECF Nos. 20, 38 ("AR") (unredacted 2019 contract award justification and approval, hereinafter "the 2019 J&A").[2]  "Minowitz was a viable business entity at the time of award for contract SPRDL1-16-C-0004, . . . the last spares contract that APUs were delivered against," but it later went out of business.  *Id.*  "With Minowitz no longer a source," the "Defense Logistics Agency – Warren (DLA)," the contracting authority for the APUs at the time, "issued a new competitive [firm fixed price ("FFP")] solicitation for APUs that was awarded to Essex Electro Engineer, Inc. (Essex) on 01 August 2017."[3]  *Id.* at 836–37.

Essex's contract was a "3 year Indefinite-Delivery Indefinite-Quantity (IDIQ) [contract] . . . with a minimum quantity of 9 each and a maximum quantity of 150 each."  *Id.* at 837.  Since Essex had not previously produced APUs, it was required to complete "First Article Testing (FAT) which was due on 10 August 2018."[4]  *Id.*  Essex requested DLA to extend the FAT deadline "to 29 March 2019, with the assurance that the contractor that deliveries would remain on schedule if FAT was approved by the end of April 2019."  *Id.*  An Army Statement of Urgency Worksheet, dated 7 November 2018, states, "[w]hen Essex was awarded the 3 year [long term contract ("LTC")], [Program Executive Office Ground Combat Systems ("PEO GCS")] Quality Assurance expressed concerns of Essex['s] historical delinquencies on government contracts and legality actions against the government."  AR at 559.  Additionally, in October 2018, personnel in the Defense Contract Management Agency ("DCMA") Chicago office informed the Army "Essex is accustomed to poking holes in [Technical Data Package

---

[1] Plaintiff held contracts to supply APUs to the government in 2005 and 2007.  AR at 90 (BidLink Report).  The record similarly indicates as part of those contracts, plaintiff passed First Article Test approval in 2006.  AR at 87–89 (plaintiff's Defense Contract Management Agency First Article Test approval dated 1 November 2006).  The APUs Minowitz manufactured were different from those plaintiff previously manufactured:  "there have been nine revisions to the main APU drawing in the Technical Data Package since 2009."  Def.'s Cross-Mot. for J. on the Admin. R. & Resp. in Opp'n to Pl.'s Mot. for J. on the Admin. R. at 16, ECF No. 32.

[2] The government effectively filed the administrative record in two parts:  the bulk of the administrative record (pages 1–835) was filed 24 January 2020 at ECF No. 20, while the remainder (pages 836–41) filed 23 April 2020 at ECF No. 38 (the unredacted 2019 J&A) at the Court's request, discussed in greater detail *infra*.  The Court hereafter cites to the administrative record as if it was filed as a single, comprehensive document comprising pages 1–841.

[3] Plaintiff competed for this contract, but it was ultimately awarded to Essex.  AR at 281 (8 August 2019 letter from plaintiff's counsel to the Contracting Officer).

[4] Federal Acquisition Regulation 9.302 provides, "[f]irst article testing and approval . . . ensures that the contractor can furnish a product that conforms to all contract requirements for acceptance."

("TDP")] and pushing dates out on their contracts and this is what is happening to this current contract with Essex." *Id.* (7 November 2018 Statement of Urgency Worksheet).

During this 2017–18 timeframe, after Minowitz went out of business, "BAE Systems looked for interest from companies in the current supply system, ultimately selecting Fischer Panda Generators, Inc." *Id.* at 418 (Fischer Panda FAT Report dated 25 January 2018). BAE Systems therefore performed first article testing of Fischer Panda's APU to ensure it met the government's APU specifications. *Id.* The testing took place from 10 August 2017 to 31 August 2017. *Id.* On 25 January 2018, BAE Systems issued Fischer Panda's FAT approval for APU production.[5] *Id.* at 415.

In February 2018, concerned that Essex would not pass FAT, "the M88 APU inventory manager and [U.S. Army Tank Automotive Research, Development and Engineering Command ("TARDEC")] engineer contacted Fischer Panda to see if they could supply APUs." AR at 536 (2018 draft J&A). Fischer Panda responded that "they could produce within 5 – 6 months after award of contract at a rate of 15 per month." *Id.*

The Contract Specialist for the APU procurement authored an undated Market Research Report, which summarized the market research conducted to locate other potential APU suppliers. *Id.* at 504. The report indicates the Army used the following sources to research suppliers: (1) "Yahoo, Google, and GSA;" (2) "Prior Commercial Survey from [the Essex contract];" (3) "Dynamic Small Business search;" (4) "[Federal Prison Industries]/UNICOR search;" and (5) "Procurement History." *Id.* The Market Research Report included the following findings:

> The Auxiliary Power Unit (APU) is a noncommercial item. Contract SPRDL1-17-D-0119 was awarded to Essex Electro Engineering and Essex Electro Engineering failed FAT. The APU is not offered from the mandatory sources of supply FAR 8.002(a)(1)(i) thru (v). Also continuous extension of the FAT completion date has created an urgent buy for APUs.

> The DLA Acquisition office sent out a full and open APU market survey in March-April 2017 to see if a vendor can manufacture[] the APUs. Dewey Electronics Corp., Tecmotiv, and Alturdyne Power Systems replied to the APU market survey

---

[5] During oral argument, plaintiff's counsel asserted "[t]he record shows that Fischer Panda got its FAT in March of 2018, yet the Government had contacted them in . . . 2018, in February." Tr. at 16:18–21, ECF No. 42. The government confirmed in its supplemental briefing, "[i]t is now apparent . . . that the J&A contains a scrivener's error because it reflects March 2018 as the date of Fischer Panda's FAT approval." Def.'s Resp. to Pl.'s Suppl. Br. at 6, ECF No. 40. The government pointed out, however, that plaintiff

> was aware of this error as early as October 10, 2019, because in a footnote in its protest at the GAO it stated that '[t]he Agency Report repeatedly contends that the Awardee passed FAT in March 2018, citing its TAB 17. As the document itself states, the FAT Report was issued on January 25, 2018.' The significance of this distinction was not evident to us until April 23, 2020, during the oral argument in this matter, when SSI raised concerns that the Army had appeared to contact Fischer Panda before it had passed FAT . . . .

*Id.* (internal citation omitted) (quoting AR at 464 n.2 (plaintiff's GAO Protest)).

> with an interest to manufacture the APUs however these vendors have never
> manufacture[d] this APU.  Based on this information, the Integrated Product Team
> ["IPT"] contacted Panda Fisher [sic] to see if Panda Fisher [sic] could
> manufacture[] the APUs.
>
> Panda Fisher [sic] informed the IPT, Panda Fisher [sic] has manufactured the APUs
> for contract W56HAV-14-C-0298 and SPRDL1-18-D-0043.  Also Panda Fisher
> [sic] can reduce the Production Lead Time (PLT) with a shorter Delivery Schedule
> since Panda Fisher [sic] has already passed FAT.

*Id.*  Based on these findings, as well as the increasingly urgent requirement for the APUs as more
time passed without Essex passing FAT, the Army concluded it would pursue a sole source
award to Fischer Panda.  *Id.*

An undated[6] DLA Justification and Approval for Other than Full and Open Competition
("2018 draft J&A") explains the Army's interest in Fischer Panda's potential to supply the APUs
before Essex could pass FAT on its contract:

> [Army Tank-Automotive & Armaments Command ("TACOM")] has been actively
> researching alternatives to increase available stock and determined Fischer Panda,
> Inc., a new supplier of APUs, can start making deliveries of 15/month in 5 to 6
> months after contract award.  Fischer Panda is a qualified source who has a
> production contract with BAE in support of GCS-CRS M88A2 production
> program.  This urgent buy will support the reduction of the Government's backlog
> while Essex works on completing FAT due in August 2018 and deliveries begin
> July 2019.
>
> There will [be] 15 months before Essex starts delivery if they pass FAT which is
> due in August 2018.  Essex stated in April 2018, they will not be able to deliver
> earlier due to securing additional work but to the best of their ability plan to deliver
> early for all three production orders at no additional cost to the government
> presuming we are successful. . . .
>
> If a contract is awarded to Fischer Panda Inc. for a quantity of 125 each it will take
> 5-6 months for deliveries to begin after award due to Fischer Panda is a qualified
> source [sic] (FAT will not be required).  This lead time is acceptable and will start
> to fulfill the Army's backorders. . . . There is no stock on hand and stock out date
> was 09 August 2017.

AR at 535.

The record similarly reflects, under table of contents heading "[Procurement Request
Order Number ("PRON") Attributes Forms," the government's plan to award a sole source

---

[6] This 2018 draft J&A was signed by four different individuals within the Army on different dates spanning from 25
April 2018 to 1 May 2018.  AR at 537–38.  The 2018 draft J&A was never approved.

contract to Fischer Panda during this time.  One of these forms, entitled "355 Attributes," was created on 16 May 2018.  *Id.* at 508.  That form states:

> This action is an emergency buy to be awarded to Fischer Panda.  Fischer Panda is a qualified source for this item and recently completed FAT on another contract in [January] 2018.  The STA 282 for the current action indicates a FAT requirement.  Since Fischer Panda has passed the FAT requirement on another contract for the same item please delete the FAT requirement for this action.

*Id.*

The record additionally contains Army Materiel Command ("AMC") Form 1095G, dated 3 November 2018.  *Id.* at 520–28.  That form shows the Army contemplated purchasing 125 APUs from Fischer Panda on a sole source basis.  *Id.* at 521–22.  The form also states:

> The TDP was updated under DLA-Warren PRON EH8E0805EH in Mar-Apr 2018.  Old PRON EH8E0805EH will be canceled due to item moved from DLA to ACC-Warren.  [J&A] was completed under old PRON.  Looking to award as soon as possible to Fischer Panda with deliveries 6 months after award; [Required Delivery Date ("RDD")] June 2018.

*Id.* at 522.

On 7 November 2018, an individual with the TACOM, Army Working Capital Fund sent a draft J&A for a Fischer Panda sole source award to an ACC-WRN Contracting Officer by email attachment.  AR at 518–19.  Later, on 20 November 2018, the ACC-WRN Contracting Officer assigned this procurement to another ACC-WRN official by email, stating the inventory manager needed the sole source contract "within 2 months."  *Id.* at 518.

### B.  The Instant Procurement

Purchasing office responsibility was officially transferred from DLA to TACOM on 18 December 2018 by modification to the Essex contract.[7]  AR at 583 (18 December 2018 modification of Essex contract).  Once procurement authority was transferred, the Army discussed steps to award the contract by February 2019.  *Id.* at 561–62 (November 2018 emails between TACOM Major Item Manager and ACC-WRN Contract Specialist, where the Contract Specialist stated, "[w]e will do our best to get this procurement action with a target award date (TAD) of mid Feb 2019.").  An internal email sent on 29 January 2019, however, confirms the Army could not "pursue the urgent buy if Essex plans on completing FAT in March 2019."[8]  *Id.* at 570 (29 January 2019 email from TACOM Major Item Manager to various TACOM

---

[7] The record is not clear why the procurement was transferred from DLA to ACC.  An internal email from a Combat Maneuver & Recovery Product Support Integration Directorate Requirements Officer sent to another individual in TACOM on 31 October 2018 states, "[Inventory Manager] originally put this procurement in for DLA to process, but with the change in DLA policy of not working purchase requisitions for assets with a Maintenance Repair Codes (MRC) of O, F, or Z she was instructed to cancel the PRON and re-input for ACC to procure."  AR at 687.

[8] Another internal email from a TACOM Major Item Manager sent to a DLA official on 2 November 2018 indicated ACC would not "be able to do an urgent buy when we have a [long term contract] in place with Essex."  AR at 706.

personnel). Therefore, the Army put the "urgent buy . . . on hold until March when we will find out if Essex has completed FAT." *Id.*

After ACC-WRN issued a cure notice to Essex on 12 February 2019, Essex failed to complete FAT by the 29 March 2019 deadline. *Id.* at 837 (unredacted 2019 J&A). Around that same time, "[i]n February 2019, the M88 APU inventory manager and [Combat Capabilities Development Command ("CCDC")] engineer contacted Fischer Panda to see if they could supply APUs on a new spares contract." *Id.* at 838. "Fischer Panda responded that it could produce with a nine month lead time after contract award at a rate of 15 to 20 per month." AR at 838.

Of key interest in this bid protest suit, on 18 April 2019, the Army issued Request for Information ("RFI") W56HZV-19-R-0050 to FedBizOpps ("FBO") "to find an interested vendor that has already manufactured the Auxilliary [sic] Power Units . . . for the federal government and has received an approved First Article Test (FAT) waiver [sic]." *Id.* at 210 (18 April 2019 RFI), 215 (unredacted 2019 J&A). The RFI questionnaire specifically asked whether the respondent could produce at least 15 APUs per month following a 9-month production lead time and whether the respondent had received an approved FAT waiver. *Id.* at 211. Before the RFI closed seven days later, on 25 April 2019, two businesses responded to the RFI: Artemis Electronics and Marvin Land Systems, Inc. *Id.* at 838 (unredacted 2019 J&A). Neither vendor was able "to meet the required APU FAT and therefore, cannot be considered for award of this urgent requirement." *Id.* Neither plaintiff nor intervenor responded to the RFI.[9]

Soon thereafter, on 14 May 2019, ACC-WRN terminated Essex's contract for default due to its failure to meet FAT. *Id.* at 406.

On 12 June 2019, the Competition Advocate approved the Justification & Approval for Other than Full and Open Competition ("the 2019 J&A") for this procurement. AR at 841 (unredacted 2019 J&A). The 2019 J&A begins by describing the supplies needed:

> The APU consists of a Hatz 2G40 2-cylinder diesel engine coupled to a chain-driven gear case that in turn drives a hydraulic pump and a 300-Amp generator. The APU provides electrical and hydraulic power to the M88A1/A2 Recovery Vehicles for auxiliary and emergency functions. The APU is used to charge the vehicle batteries, power the hydraulic impact wrench, and power the refuel/defuel pump. The M88 Recovery Vehicle provides battle field recovery operations in support of the light and medium tactical vehicles, M1/M1A1 Abrams, and any other current and future 70 ton class vehicles.

---

[9] During oral argument, the Court asked counsel for plaintiff why plaintiff did not respond to the RFI. Counsel for plaintiff responded, "I don't know the answer to that. . . . I don't know if they were aware of it." Tr. at 14:14–16, ECF No. 42. In an 8 August 2019 response to an email from the Contracting Officer sent to plaintiff's counsel on 8 August 2019, which referenced the RFI, plaintiff's counsel stated he read about the RFI "in the J&A but it was only open for 7 days which makes it pretty easy to miss." AR at 669.

Additionally, although Fischer Panda did not respond to the RFI, the record shows Fischer Panda responded to an ACC Market Research/Commercial Item Survey, which it signed on 29 May 2019. AR at 642. Fischer Panda's response indicated it required 9 months for production but could supply 15 to 20 APUs per month. *Id.*

*Id.* at 836.

The 2019 J&A cited 10 U.S.C. § 2304(c)(2), as implemented in Federal Acquisition Regulation ("FAR") 6.302-2(a)(2), for authority to issue the sole source procurement "because the subject item is currently in a critical supply position." *Id.*  The Army explained because Minowitz went out of business and the Essex contract was terminated for default due to Essex's inability to timely pass FAT, "the Army now has an urgent need for a quantity of 210 each APUs."[10]  *Id.* at 836–37.  The 2019 J&A further highlighted the urgency and importance of procuring the APUs:

> The continued APU out-of-stock position will result in Soldiers' inability to perform their mission, placing them in immediate danger.  A vehicle in need an of APU replacement is inoperable until the new APU is installed.  If the backorder and current stock is not fulfilled, Soldiers are placed in direct danger because of deadlined vehicles, putting Soldiers' safety at risk and causing an inability to carry out their mission.

*Id.* at 837–38.

The Army explained in the 2019 J&A that "FAT is required to validate prospective contractors have the manufacturing capability, processes, and facilities to produce the APUs [in accordance with] the technical requirements of this procurement." *Id.* at 837.  Further reinforcing the importance of FAT, the 2019 J&A emphasized "[t]he Acquisition Lead Time (ALT) for a new contract is 10 months, and the Production Lead Time (PLT) is a minimum of 9 months without FAT and 15 months with FAT."  AR at 837.  The Army thus "determined no other type of quality assurance testing is acceptable."  *Id.*

The 2019 J&A identified Fischer Panda as "an existing subcontractor to British Aerospace Engineering (BAE) in support of the Ground Combat Systems-Combat Recovery Systems (GCS-CRS) M88A2 production program," and "is a current supplier of APUs and is a qualified source, receiving FAT approval in [January] 2018." *Id.*  Citing Fischer Panda's ability to "start delivery of 15 to 20 units per month within 9 months after contract award," the Army concluded, "[a]ward of this urgent requirement to Fischer Panda will fulfill the Army's backorders and continuing urgent requirements until a competitive contract can be awarded."  *Id.*

Under the "Market Research" heading, the 2019 J&A explained the "CCDC Engineering and Quality Assurance Subject Matter Experts (SMEs) frequently perform research pursuant to FAR 10.002(b)(2).  The SMEs consider current market conditions on vehicles and variants, components, and the capabilities of industry to accomplish the proposed effort when evaluating potential vendors." *Id.* at 838.  Most relevant here, the market research detailed that:

---

[10] The J&A also stated, "[c]oncurrent with this urgent action, [the Army] will solicit and award a new competitive IDIQ contract to fulfill future non-urgent requirements."  AR at 837 (unredacted 2019 J&A).  The government confirmed "[o]n April 16, 2020, the Army issued Solicitation W56HZV-19-R-0306, the competitive procurement for the APUs."  Def.'s Reply in Supp. of its Cross-Mot. for J. on the Admin. R. at 8, ECF No. 36.

In February 2019, the M88 APU inventory manager and CCDC engineer contacted Fischer Panda to see if they could supply APUs on a new spares contract. Fischer Panda responded that it could produce with a nine month lead time after contract award at a rate of 15 to 20 per month. Engineering determined Fischer Panda was the only provider that could start production of the APU without FAT. Fischer Panda can start delivery earlier compared to other vendors because Fischer Panda has a current FAT approval. Fischer Panda has previously produced these units, both as a subcontractor for the M88 vehicle production contract (W56HZV-14-C-0298), and as a prime contractor for Modification Kits (SPRDL1-18-D-0043), of which the APU is a subassembly. Based on this information and since Fischer Panda passed FAT in [January] 2018, FAT is not a requirement for this procurement. With the elimination of FAT, Fischer Panda production lead time is substantially less compared to other vendors and can meet the Army's schedule requirement.

*Id.* at 838–39.

On 31 July 2019, the Army Contracting Command issued Solicitation No. W56HZV-19-R-0050 (the "Solicitation"). AR at 19 (31 July 2019 sole source Solicitation). The Solicitation was posted to FBO on 1 August 2019. *Id.* at 80 (screenshot of FBO listing for the Solicitation). The FBO listing stated:

> This solicitation is a sole source award to Panda Fisher [sic] for Auxillary [sic] Power Units. [In accordance with] FAR 6.305 (b) the justification shall be posted within 30 days. A previous sources sought was published and no interested parties meet the requirements of the sources sought.
>
> No vendors replied to sources sought with a required FAT Waiver for this requirement.

*Id.* The Solicitation, however, did not require First Article Testing. The next day, on 2 August 2019, the Army published the 2019 J&A to FBO. *Id.* at 410 (print preview of FBO listing for the Solicitation).

On 8 August 2019, plaintiff sent a pre-protest letter to the Contracting Officer ("CO") "to bring discrepancies in the . . . Solicitation to the attention of the contracting activity."[11] *Id.* at 280. Specifically, the letter claimed the 2019 J&A's assertion that no sources other than Fischer Panda had an approved FAT was "simply wrong and does not reflect information readily available to the CCDC." *Id.* at 281. In support of this, plaintiff pointed out, "CCDC made no attempt to contact [plaintiff] notwithstanding [plaintiff] has previously produced [plaintiff] APUs as a prime contractor on at least 4 other contracts." AR at 281. Additionally, plaintiff highlighted its proposal in the competitive procurement which resulted in award to Essex in 2017. *Id.* Plaintiff thus asserted "[t]he underlying market and procurement research underlying the J&A is fatally

---

[11] Plaintiff expressed in a subsequent 15 August 2019 letter addressed to the contracting activity, discussed *infra*, its "understanding that the undersigned's letter of 8 August 2019 is being processed as an agency protest." AR at 285 n.1.

flawed and therefore does not reasonably justify the adequacy of the rationale and conclusions set forth therein," and expressed its intent to protest the award if the government did not withdraw the Solicitation. *Id.* Plaintiff enclosed its 1 November 2006 FAT approval to its pre-protest letter. *Id.* at 282–84.

After reviewing the letter and appended documentation, on 14 August 2019, the Army held a conference call with plaintiff, during which it invited plaintiff to submit a FAT waiver request. *Id.* at 285 (15 August 2019 letter from plaintiff's counsel to the ACC-WRN Supervisory Contract Specialist). The next day, on 15 August 2019, plaintiff submitted the waiver request to the Supervisory Contract Specialist.[12] *Id.* In response to plaintiff's counsel's inquiry why it needed to submit a FAT waiver despite the Solicitation's lack of FAT requirement, the Contracting Specialist explained, "[t]his is not a competitive procurement. The reason it's restricted to Fischer Panda is that FAT is not required for Fischer Panda. Any other source that would be considered for this procurement must have FAT waived." AR at 664–65 (12 August 2019 email chain between plaintiff's counsel and ACC-WRN Contracting Specialist). Plaintiff submitted the FAT waiver "with the understanding that, if the FAT Waiver is approved, the Solicitation will be modified in a manner which would provide [plaintiff] the opportunity to compete for a contract to meet the Government's stated urgent requirement for the stated quantity of the APUs." *Id.* at 285–86. On the FAT Waiver Worksheet, plaintiff acknowledged its "facility has relocated to a different physical location since completion" of Defense Contract Management Agency ("DCMA") Contract No. W56HZV-05-CO546, the contract for which plaintiff received its FAT approval in 2006. *Id.* at 287.

On 29 August 2019, plaintiff submitted a proposal in response to the Solicitation. *Id.* at 294. Plaintiff offered to supply the APUs at a cost of [XXX] each, or for a total of [XXX]. *Id.* at 297.

On 30 August 2019, the CO sent a letter in response to plaintiff's 8 August 2019 pre-protest letter. *Id.* at 355. The CO wrote, "[i]n light of the GAO level protest filed by SSI Technology on 29 August 2019, the Army's response to the pre-protest letter will be included, as necessary, in the Agency report we send to the GAO." AR at 355.

On 4 September 2019, Army CCDC Quality Assurance and Engineering completed its review of SSI's FAT waiver and recommended the Army deny the waiver request. *Id.* at 402 (document titled "355 Attributes" and last modified 10 September 2019). The Army concluded:

> While there is no formalized FAT specifically defined in the TDP for this procurement, there are some specific Acceptance Requirements which constitute a FAT, that need to be met prior to going into production. . . .
>
> Due to the fact that the Contractor (SSI) has not produced this part in over 10 years, has not completed a successful FAT on this part in the past 13 years and has had a major change in their process, by moving their manufacturing location of this part,

---

[12] The CO's 27 September 2019 letter indicates plaintiff submitted the FAT waiver request on 16 August 2019. AR at 408.

Quality Assurance and Engineering are recommending that the FAT Waiver Request for this PRON be denied.

*Id.*

On 13 September 2019, the CO posted the pre-solicitation synopsis for this procurement on FBO. *Id.* at 404–05 (screenshot of FBO listing).

Finally, on 27 September 2019, the CO notified plaintiff the Army denied plaintiff's FAT waiver request. *Id.* at 408 (27 September 2019 letter from CO to plaintiff). The CO provided the following reasons for denying plaintiff's FAT waiver: (1) "SSI Technology has not produced this APU in over 10 years;" (2) "SSI Technology has not passed FAT for this APU in the past 13 years;" and (3) "SSI Technology has had a major change in its processes by moving its manufacturing facility since this APU was last produced." *Id.* The CO noted, however, "[i]f the FAT waiver request was approved, Solicitation W56HZV-19-R-0050 would have been amended to list SSI Technology as a limited source along with Fischer Panda." AR at 408.

## C.  GAO Protest History

On 29 August 2019, plaintiff filed a protest before the GAO. *Id.* at 1 (GAO docket). Plaintiff argued the 2019 J&A "was factually and legally flawed" because it claimed the Army knew plaintiff was a potential APU supplier, yet failed to contact or consider plaintiff before deciding "to make a sole source award to Fischer Panda." *Id.* at 110–11 (SSI GAO Protest). Plaintiff similarly challenged the 2019 J&A's professed need for FAT approval despite the absence of FAT requirement in the Solicitation. *Id.* at 113. On 4 December 2019, GAO denied the protest, and released its decision publicly on 19 December 2019. *Id.* at 3. GAO found "to the extent the J&A contained factual inaccuracies—such as not stating that SSI had previously received FAT approval of the APUs in 2006 or failing to contact SSI to ascertain its capabilities prior to the execution of the J&A—SSI has failed to demonstrate how it has been prejudiced by those errors." *Id.* at 502. GAO similarly concluded plaintiff's challenge to the lack of FAT requirement in the Solicitation "provide[s] no basis to sustain the protest." AR at 503.

## D.  Procedural History Before This Court

Plaintiff filed its complaint in this protest on 23 December 2019, along with its motion to file the complaint under seal, motion for a protective order, and application for temporary restraining order and motion for preliminary injunction. Compl., ECF No. 1; Pl.'s Mot. for Leave to File Compl. Under Seal & Mot. for Protective Order, ECF No. 4; Appl. for TRO & Mot. for Prelim. Inj., ECF No. 5. Pursuant to the Court's 27 December 2019 Order, on 30 December 2019, plaintiff and the government filed a joint status report. *See* Joint Status Report, ECF No. 8. In the joint status report, the government agreed to stay award of the contract pending this protest "with the proviso that – should mission critical circumstances materialize requiring the Army to award the contract – the Army would provide the Court, SSI, and the Department of Justice a notice of the Army's intent to award the contract 10 calendar days before making an award." *Id.* at 1.

The Court held a preliminary scheduling conference on 2 January 2020.  *See* Order, ECF No. 7.  The same day, prior to the call, Fischer Panda filed a motion to intervene, which the Court granted to allow it to join the conference.  *See* Mot. to Intervene on Behalf of Fischer Panda Generators, ECF No. 9; Order, ECF No. 10.  Also on 2 January 2020, the Court granted plaintiff's motion for leave to file its complaint under seal and motion for a protective order, but deferred ruling on plaintiff's motion for temporary restraining order and preliminary injunction. Order, ECF No. 11; Protective Order, ECF No. 12.

The next day, on 3 January 2020, plaintiff filed an amended complaint to highlight that mission critical circumstances did not presently exist, quoting the government's proviso to the voluntary stay in this case.  *See* Am. Compl. ¶ 73, ECF No. 13.

On 24 January 2020, the government filed the administrative record in this matter.  *See* AR.  On 18 February 2020, plaintiff filed its motion for judgment on the administrative record. *See* Pl.'s Mot. for J. on the Admin. R., ECF No. 22 ("Pl.'s MJAR").  On 23 March 2020, the government filed its response to plaintiff's motion and cross-motion for judgment on the administrative record.  *See* Def.'s Cross-Mot. for J. on the Admin. R. & Resp. in Opp'n to Pl.'s Mot. for J. on the Admin. R., ECF No. 32 ("Def.'s MJAR").  Plaintiff filed its response to the government's cross-motion and reply in support of its motion on 6 April 2020.  *See* Pl.'s Reply to Def.'s Opp'n to Mot. for J. on the Admin. R. & Resp. in Opp'n to Def.'s Cross-Mot. for J. on the Admin. R., ECF No. 34 ("Pl.'s Resp. & Reply").[13]  Finally, on 17 April 2020, the government filed its reply in support of its cross-motion.  *See* Def.'s Reply in Supp. of its Cross-Mot. for J. on the Admin. R., ECF No. 36 ("Def.'s Reply").

The Court held a telephonic oral argument on plaintiff's and the government's cross-motions for judgment on the administrative record on 23 April 2020.  *See* Order, ECF No. 31. During oral argument, plaintiff's counsel raised factual issues not addressed in its briefing— factual issues regarding Army communications with Fischer Panda prior to February 2019 that were detailed in the administrative record and in alleged conflict with statements made in the 2019 J&A.  *See* Tr. at 15:2–18:20, 23:1–2, 38:2–22, ECF No. 42.  The Court thus ordered supplemental briefing on this issue, which was completed on 28 April 2020.  *See* Order, ECF No. 37.

## II.   Legal Standards

### A.  Bid Protest Jurisdiction & APA Standard of Review

The Tucker Act provides this Court jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of a statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C.

---

[13] On 6 April 2020, plaintiff originally filed its response and reply which erroneously listed the government's counsel in addition to plaintiff's counsel on the cover page (ECF No. 33).  On 7 April 2020, plaintiff filed an additional response and reply with a corrected caption (ECF No. 34).  On 10 April 2020, the Court struck ECF No. 33 from the record and granted plaintiff leave to file the corrected version of the response and reply, ECF No. 34. *See* Order, ECF No. 35.

§ 1491(b)(1).  In rendering such judgment, this Court "review[s] the agency's decision pursuant to the standards set forth in section 706 of title 5." *Id.* § 1491(b)(4).  "Among the various [Administrative Procedure Act] standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. §706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000)).  Under this standard, "a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).  "The arbitrary and capricious standard applicable here is highly deferential," and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."  *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

### B.  Judgment on the Administrative Record in a Bid Protest

Rule 52.1(c) of the Rules of the Court of Federal Claims "provides for judgment on the administrative record."  *Huntsville Times Co. v. United States*, 98 Fed. Cl. 100, 104 (2011).  Rule 52.1(c) was "designed to provide for trial on a paper record, allowing fact-finding by the trial court."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).

"[A] sole-source award may be set aside if either:  (1) the sole-source award lacked a rational basis; or (2) the sole-source procurement procedure involved a violation of a statute, regulation, or procedure."  *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001).  "When a party contends that the procurement procedure in a sole-source case involved a violation of a statute, regulation, or procedure, it must establish prejudice by showing that it would have had a substantial chance of receiving the award."  *Id.*  "A disappointed party can establish prejudice either by showing:  (1) proceeding without the violation would have made the procurement official's decision to make a sole-source award rather than to conduct a competitive bidding process irrational, and in a competitive bidding process, the complaining party would have a substantial chance of receiving the award; or (2) proceeding without the violation, the complaining party would have a substantial chance of receiving the sole-source award."  *Id.* (internal citations omitted).

### C.  Permanent Injunction

When deciding whether a permanent injunction is warranted,

> a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).

### III.   Analysis

#### A.   The Parties' Arguments

Plaintiff argues the Army violated two provisions of the FAR in this sole source procurement.  First, plaintiff contends the Army violated FAR 6.302-2 "by failing to solicit offers from as many sources as practicable" because it claims as a previous APU supplier, it was a qualified source that the Army should have considered.  Pl.'s MJAR at 16.  Second, plaintiff asserts the Army violated FAR 1.602-2(b), holding plaintiff and Fischer Panda to a different FAT standard because the Army required plaintiff to request a FAT waiver, but did not for Fischer Panda.  *Id.* at 13–14.  The government, on the other hand, argues it went beyond what the FAR required to maximize competition, but Fischer Panda was the only qualified source to meet its urgent need for APUs.  Def.'s MJAR at 11–13.  Additionally, the government maintains it was reasonable for the Army to require plaintiff to submit a FAT waiver request, and it was reasonable for the Army to deny the FAT waiver due to the amount of time since plaintiff last passed FAT and produced APUs.  *Id.* at 15–16.

#### B.   Whether the 2019 J&A is Arbitrary, Capricious, or Otherwise Not in Accordance with Law

Plaintiff argues the government violated FAR 6.302-2(c)(2) "by failing to solicit offers from as many sources as practicable."  Pl.'s MJAR at 16.  Plaintiff asserts "the Contracting Officer improperly relied on a legally and factually deficient J&A for its decision to make a sole source award to Fischer Panda" because it claims the J&A's contentions that Fischer Panda "is the only approved source for this requirement" and "[n]o other contractor has passed FAT" are "demonstrably false."  *Id.*  Plaintiff maintains these factual conclusions are false because plaintiff was "a prior supplier that had passed FAT for the APUs, facts known and in the possession of the government."  *Id.* at 17.  Moreover, plaintiff indicates "the Government provides no information how it confirmed or otherwise came to these conclusions."  *Id.*  Although the government published a Request for Information, plaintiff points out it was only open for seven calendar days.  *Id.*  Additionally, plaintiff suggests there were several other potential suppliers who competed for prior procurements the government could have contacted beyond intervenor, including plaintiff.  *Id.*

In response, the government argues "[t]he record in this case establishes that the Army was interested in reaching out to as many vendors as possible and did more than was legally required to do so."  Def.'s MJAR at 11.  For example, "although not required by the FAR, the contracting officer published an RFI to identify APU vendors other than Fischer Panda and posted it for seven days."  *Id.*  Additionally, while not required to do so, the Army published the RFP.  *Id.* at 11.  Similarly, "although the Army was required to make 'publicly available' the J&A, it was not required to do so until 30 days after contract award," and the Army published the J&A prior to award.  *Id.* at 12 (emphasis omitted).  Viewing these actions in the aggregate, the government argues, "[i]n effect, the Army notified any source that could potentially qualify for a FAT approval or waiver of the Army's intentions before a contract award, which is exactly how SSI became aware of this procurement."  *Id.*  Further, contrary to plaintiff's assertion that the Army did not consider other sources for this procurement, "the Army analyzed possible sources

that had an approved FAT for the Hatz APU, or would likely qualify for a waiver," and Fischer Panda "was the only known source." *Id.* at 14. "Due to the lapse in production from any competitive spare part APU contract, the Army concluded, no other sources were likely eligible for FAT waiver." Def.'s MJAR at 14. The government thus asserts plaintiff "misses the point" by claiming "the Army did not consider sources that do not have current FAT approval or waiver," even though the solicitation did not require FAT because "[w]hat is required for this procurement is that the prospective vendor have an approved FAT or a FAT waiver." *Id.*

Plaintiff raised additional arguments during and after oral argument focused on four alleged factual discrepancies between the 2019 J&A and the rest of the record. The Court ordered supplemental briefing to address these arguments in detail.[14] First, plaintiff challenges the urgency of this procurement because "the Government's assertion that it diligently pursued resolution of its urgent need, including with all known suppliers, for the APUs is inconsistent with the 18-month gap in time between when it first claimed an urgent need and when it published the J&A on August 2, 2019." Pl.'s Suppl. Br. at 2. Second, plaintiff asserts that although the 2019 J&A states the Army contacted Fischer Panda in February 2019, the record shows the Army contacted Fischer Panda as early as February 2018, a year prior.[15] *Id.* at 2, 5. Third, plaintiff claims "[t]he apparent motivation for seeking to contract only with Fischer Panda appears to have been to create a backup or alternative supplier via sole source," a motivation plaintiff argues came to fruition in early 2018. *Id.* at 2, 6. Fourth, plaintiff complains the Army "made no effort to make contact with SSI" even though in "June 2018, the Army specifically identified [plaintiff] as one of only 3 prior manufacturers of the APUs." *Id.* at 2.

The government responds that plaintiff's "assertions misconstrue the documents in the administrative record, misrepresent relevant facts, and attribute motivations to Department of Defense staff that are speculative and contradicted by factual record evidence." Def.'s Resp. to Pl.'s Suppl. Br. at 2. First, the government details the urgency of procuring APUs since Minowitz went out of business in 2017, explaining "[t]he Government was in a quandary and explored every possibility to meet its APU needs while abiding by its contractual obligations with Essex." *Id.* at 4–5. Second, the government disputes plaintiff's assertion that the government contacted Fischer Panda prior to it passing FAT, indicating the 2019 J&A "contains a scrivener's error" as to the date of Fischer Panda's FAT approval. *Id.* at 6. Third, the government explains the Army did not make a decision to award a sole source contract to Fischer Panda in early 2018 because: (1) "DLA was the only agency with authority to make this decision in early 2018, not the Army;" and (2) "while DLA and TACOM personnel considered the possibility of a sole source award to Fischer Panda in 2018, DLA ultimately decided against it." *Id.* at 6–7. Fourth, the government argues plaintiff "was not then, and is not now, a viable solution to fulfill the Army's urgent need for APUs" because it "submitted no evidence to the Army, or to this Court, that it previously has manufactured the exact APU the Army currently

---

[14] On 24 April 2020, plaintiff filed its supplemental brief addressing the alleged factual discrepancies. *See* Pl.'s Suppl. Br. in Supp. of its Mot. for J. on the Admin. R., ECF No. 39. On 27 April 2020, the government filed its response to plaintiff's supplemental brief. *See* Def.'s Resp. to Pl.'s Suppl. Br., ECF No. 40. On 28 April 2020, Fischer Panda filed its response to plaintiff's supplemental brief. Intervenor's Resp. to Pl.'s Suppl. Br., ECF No. 43.
[15] Plaintiff also claims this contact took place before BAE issued Fischer Panda's FAT. Pl.'s Suppl. Br. at 6. For the same reasons discussed *supra* at note 5, the Army did not contact Fischer Panda prior to receiving FAT approval; plaintiff acknowledged this fact in its GAO protest. *See* AR at 464 n.2 (SSI comments to Agency Report from previous GAO protest).

requires and that it would be able to manufacture them and begin delivery within the required time frame." *Id.* at 7.

## 1. Solicitation from as Many Sources as Practicable

The Competition in Contracting Act ("CICA") requires government agencies conducting a procurement to "obtain full and open competition through the use of competitive procedures in accordance with the requirements of this chapter and the Federal Acquisition Regulation." 10 U.S.C. § 2304(a)(1)(A). The exception to this statutory requirement most relevant to this case permits an agency to "use procedures other than competitive procedures . . . [when] the agency's need for the property or services is of such an unusual and compelling urgency that the United States would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals." *Id.* § 2304(c)(2) (also codified at 48 C.F.R. § 6.302-2(a)(2)). The FAR limits the use of the "unusual and compelling urgency" exception in noncompetitive procurements by requiring the agency to support the award by a written justification and approval and to "request offers from as many potential sources as is practicable under the circumstances." 48 C.F.R. § 6.302-2(c).

A J&A must "contain sufficient facts and rationale to justify the use of the specific authority cited." *Id.* § 6.303-2(a). Most relevant to this case, the FAR requires a J&A to include the following information:

> (4) An identification of the statutory authority permitting other than full and open competition.

> (5) A demonstration that the proposed contractor's unique qualifications or the nature of the acquisition requires use of the authority cited.

> (6) A description of efforts made to ensure that offers are solicited from as many potential sources as is practicable . . . .

> (8) A description of the market research conducted . . . and the results or a statement of the reason market research was not conducted.

> (9) Any other facts supporting the use of other than full and open competition, such as:

> . . . .

> (iii) When 6.302-2 is cited, data, estimated cost, or other rationale as to the extent and nature of the harm to the Government.

*Id.* § 6.303-2(b).

In a factually analogous case, *L-3 Communications EOTech, Inc. v. United States*, the plaintiff similarly challenged the Army's sole source award because it claimed, among other

- 15 -

things, the Army failed to maximize competition prior to the award.  85 Fed. Cl. 667, 673 (2009).  The J&A in that case stated the awardee was the only qualified producer of the M68 close combat optics ("CCO") because it was the only CCO manufacturer that had been type-classified, a form of quality assurance, under the Army's regulations.  *Id.* at 674–75.  The plaintiff argued the type-classification was not as important as the sight functioning and claimed "[b]ecause [it] received a sole source award for an alternate to the M68 CCO in 2003, . . . the Army is precluded from ignoring [the plaintiff] as a potential source for CCOs in this sole source procurement."  *Id.* at 676.  The Army responded by arguing the circumstances were different in 2003 because it did not have the opportunity to procure type-classified CCOs at that time.  *Id.* When it made the sole-source award to the awardee in 2008, however, the awardee was ready and able to meet the contract specifications and delivery schedule.  *Id.*  This Court found the plaintiff's 2003 sole source award did not prove the government failed to seek offers from as many potential sources as practicable due to changing circumstances and the Army's need for type-classified CCOs.  *Id.*  Given the importance of type-classification and the Army's urgent delivery schedule, this Court therefore found the Army's sole source award did not violate the FAR.  *Id.*

Plaintiff cites to *Innovation Development Enterprises of America v. United States*, 108 Fed. Cl. 711 (2013) throughout its motion for judgment on the administrative record.  In that case, the awardee was the incumbent contractor on a contract to support the Air Force Command Man-Day Allocation System.  *Id.* at 717.  The plaintiff repeatedly expressed interest in an upcoming procurement for the same contract, but the Air Force did not adequately prepare for the next contract.  *Id.* at 718.  It therefore awarded a sole source contract to the incumbent contractor because it claimed the incumbent was the only responsible source of the necessary services, and secondarily, due to unusual and compelling urgency.  *Id.* at 720.  The government conceded multiple violations of the FAR throughout the procurement.  *Id.* at 719.  The plaintiff argued, among other things, the government failed to request offers from as many potential sources as practicable under the circumstances by improperly ignoring plaintiff's repeated interest in the procurement.  *Id.* at 732.  This Court agreed with the plaintiff and found the Air Force's sole source award was arbitrary and capricious because, among other reasons:  (1) the J&A rested on unsupported factual conclusions; (2) the FAR prohibits reliance on both the "only one responsible source" and "unusual and compelling urgency" provisions of sole-source authority; (3) the Air Force did not conduct meaningful market research, violating the FAR; (4) the J&A failed to list plaintiff as an interested source, despite having repeatedly expressed interest; and (5) the Air Force failed to request offers from as many sources as practicable under the circumstances.  *Id.* at 729–33.

The present procurement does not suffer the same legal failings as those documented in *Innovation Development*.  In this case, the 2019 J&A invoked the "unusual and compelling urgency" exception to competitive procurements as authorization.  AR at 836.  The J&A therefore must include, among other things, "[a] description of efforts made to ensure that offers are solicited from as many potential sources as is practicable."  48 C.F.R. § 6.303-2(b)(6). Plaintiff argues the 2019 J&A was factually and legally flawed because it claims the J&A incorrectly asserts Fischer Panda was the only approved source for the APUs.  Pl.'s MJAR at 16. A detailed review of the J&A, however, shows that it thoroughly explained the urgency of the Army's requirements and the importance of the supplier having FAT approval due to this

urgency. *See* AR at 836–37. Moreover, the J&A detailed several steps the Army took to ensure it solicited offers from as many sources as possible, *inter alia*: it conducted market research; it published an RFI to FBO; and it considered the procurement history and past suppliers. *See id.* at 838–89.

To the extent plaintiff considered itself technically qualified to produce the APUs, it had the opportunity to respond to the RFI in April 2019, yet failed to do so. *See* Tr. at 14:11–15 (The Court: "[T]he Army published an RFI concerning the procurement in April 2019. Why did SSI not respond to that?" [Plaintiff's Counsel]: "Your Honor, . . . I don't know the answer to that. . . . I don't know if they were aware of it."). Ultimately, the Army's research showed the only supplier that could produce quality APUs in the least amount of time was Fischer Panda. *See* AR at 838–40. The Army's determination that, besides FAT, "no other type of quality assurance testing is acceptable," especially given the last APU production for the Army was in 2017, is tantamount to an agency's technical evaluation. AR at 837. An agency's technical evaluations are "discretionary determinations . . . that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). In short, the 2019 J&A sufficiently explains the steps the Army took to solicit offers from as many sources as practicable; it therefore does not violate FAR 6.303-2(b)(6).

The record further shows the Army had an unusual and compelling urgency to procure APUs beginning in 2017. The 2018 Statement of Urgency Worksheet details the beginning of this urgency: "[t]he US Army is in a critical supply position caused by the only supplier at the time, Minowitz Manufacturing Company went out of business at time of award of solicitation contract SPRDL116R0035." AR at 559. DLA therefore awarded a competitive contract to Essex, but because it was "Essex's first time producing the APU, First Article Testing (FAT) [was] required and . . . due in August 2018." *Id.* In the interim, TACOM "actively research[ed] alternatives to increase available stock and determined Fischer Panda Inc., a new supplier of APUs, can start making deliveries of 15/month in 5 to 6 months after contract award." *Id.* at 535. Although DLA ultimately did not move forward with that procurement in 2018, in an effort to proactively address its needs, DLA stated the "urgent buy will support the reduction of the Government's backlog while Essex works on completing FAT." *Id.* DLA, and later ACC, continued to work with Essex on obtaining FAT approval, but even after a time extension, Essex failed to pass FAT. *Id.* at 837. At this time, by April-May 2019, ACC had no other option but to terminate Essex's contract and pursue a sole source award because the backorder of APUs was only increasing. *Id.* Based on these facts and the 2019 J&A's explanation of the Army's urgent need for APUs produced by a supplier which holds a current FAT approval, the Court finds the Army properly invoked the "unusual and compelling urgency" authority to pursue a sole source award to Fischer Panda. *See Emery Worldwide Airlines, Inc.*, 264 F.3d at 1085 ("[T]he agency's action must be upheld as long as a rational basis is articulated and relevant factors are considered.") (citing *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43); *Bowman Transp.*, 419 U.S. at 285–86.

Plaintiff complains the Army did not contact it the same way the Army contacted Fischer Panda, despite knowledge that plaintiff was a prior APU supplier. Pl.'s MJAR at 16. FAR 9.303(b) provides FAT testing may be appropriate, even for a contractor which previously produced the given product for the government, where (1) "[t]here have been subsequent

changes in processes or specifications;" or (2) "[p]roduction has been discontinued for an extended period of time," among other reasons. The record shows plaintiff last contracted to produce APUs in 2009, and its FAT dates back to 2006. *See* AR at 87 (SSI 1 November 2006 FAT approval), 528 (AMC Form 1095G detailing APU procurement history). The specifications for the APU have also changed since plaintiff last produced the APU. Tr. at 31:6–20. Plaintiff further moved manufacturing facilities since its last APU production. AR at 287 (SSI Fat Waiver Worksheet).

Accordingly, the administrative record confirms that even if the Army contacted plaintiff, the combination of changes to the APU specifications and decade time gap since plaintiff last produced APUs demonstrates plaintiff was not qualified. This Court rejected similar arguments in *L-3 Communications* and reasoned the Army's prior award to supply goods does not demonstrate the Army failed to maximize competition in a subsequent procurement, particularly when the procurement is for highly technical goods for which the specifications have changed. *See L-3 Commc'ns*, 85 Fed. Cl. at 676. Likewise, in this case, just because plaintiff was a prior APU supplier does not mean—after APU specifications changed and plaintiff did not produce the same APU for years—the Army is duty-bound to solicit an offer from a vendor it reasonably concludes does not have the requisite capability. The Army's failure to contact plaintiff therefore does not render the 2019 J&A's factual conclusions arbitrary and capricious. *See Emery Worldwide Airlines, Inc.*, 264 F.3d at 1086 (quoting 5 U.S.C. § 706(2)(A) ("[A] reviewing court must set aside agency actions that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'")).

## 2.  Alleged Factual Discrepancies in the Administrative Record

Plaintiff also claims the J&A was arbitrary and capricious due to factual discrepancies. Taking these in turn, plaintiff first challenges the urgency of this procurement, noting the 18-month gap between the Army's first stated urgent requirement for APUs and its publication of the J&A. Pl.'s Suppl. Br. at 2. What this argument misses, though, is throughout 2018 and early 2019, the government was working with Essex to ensure Essex could pass FAT and produce the APUs. *See* AR at 535. The Army could still have considered its need for APUs "urgent" in 2018 despite having a contract at the time because it had not received APU shipments since 2017. The record shows the Army acted diligently in locating another APU supplier once it suspected Essex may not timely pass FAT.

Plaintiff next points to the 2019 J&A's assertion that "[i]n February 2019, the M88 APU inventory manager and CCDC engineer contacted Fischer Panda" as being inconsistent with portions of the record showing the government contacted Fischer Panda as early as February 2018. AR at 838. The record shows the government contacted Fischer Panda both in February 2018 and February 2019; these two contacts are not mutually exclusive. Nowhere in the 2019 J&A does the Army claim February 2019 was the *first* time it contacted Fischer Panda. This factual conclusion is not inconsistent with anything in the record and does not render the 2019 J&A arbitrary or capricious. As the record demonstrates, DLA reached out to Fischer Panda as soon as it learned it was a potential supplier with a January 2018 FAT approval. *See* Decl. of Sara L. Coger ¶ 6, ECF No. 30-1 ("Coger Decl."). The Army had not received APUs since prior to Minowitz going out of business in January 2017, and its needs became more significant

throughout 2018.  *See id.* ¶ 4.  Although DLA competitively awarded a long-term contract to Essex, Essex could not meet deadlines, even after extension, to timely pass FAT and fulfill the Army's urgent need.  *Id.* ¶ 5 ("At the time of termination of the contract, the FAT was past due by almost nine months. . . . Essex had twenty months to complete FAT and was unsuccessful.  The Army was unable to proceed with Essex without putting the soldiers and mission at great risk.").

Further, plaintiff urges the Army decided to award Fischer Panda a sole source contract in early 2018.  Pl.'s Suppl. Br. at 2.  The record, however, shows DLA, which had contracting authority for APU procurement at the time—not the Army—considered a sole source award and ultimately decided not to go forward despite pressing communications from the Army regarding growing APU needs.  *See* AR at 570 (29 January 2019 email from TACOM Major Item Manager to other TACOM personnel) ("The urgent buy is on hold until March when we will find out if Essex has completed FAT.").  The Court therefore finds the record does not contain any such alleged factual discrepancies rendering the 2019 J&A arbitrary and capricious.  *See Emery Worldwide Airlines, Inc.*, 264 F.3d at 1086 ("The test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.").

Plaintiff further complains the Army did not contact SSI at the time it contacted Fischer Panda.  Pl.'s Suppl. Br. at 2.  For the same reasons discussed *supra*, the Army's failure to contact was not arbitrary or capricious.  *See Emery Worldwide Airlines, Inc.*, 264 F.3d at 1085 (quoting 5 U.S.C. § 706(2)(A) ("[A] reviewing court must set aside agency actions that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'")).  Further, the Court notes the Army posted an RFI to FBO to solicit information from potential suppliers despite no requirement to do so.  *See* AR at 209–12.  Plaintiff had the opportunity to submit a response, just like the two vendors that did respond, but plaintiff did not.  *See* Tr. at 14:11–16.

Lastly, although only tangentially raised in its briefing, *see* Pl.'s MJAR at 20, during oral argument, plaintiff challenged the urgency of procuring 210 APUs, rather than a smaller number such as the 57 APU backlog the TACOM Inventory Management Specialist notes in her declaration.  *See* Tr. at 40:1–2; Coger Decl. ¶ 8.  Plaintiff urged the Court to consider the urgency of the Army procuring 210 APUs on a sole source basis since the Army recently released the solicitation for the next competitive APU procurement for 105 APUs over a three-year period.  Tr. at 40:3–19.  In response, the government explained, "the agency has been cannibalizing conversion kits and it will have to replace the APUs for those conversion kits so that vehicles that are currently using the old APU can be converted to the current APU."  *Id.* at 42:2–6.  The government continued by arguing, "the Army is in the best position to know what its urgent and compelling needs are, and that's what they've outlined.  Second guessing the Army and how many APUs are needed to keep people safe and to keep service members safe and to keep vehicles in operation, that's not our job here."  *Id.* at 42:9–15.  The 2019 J&A depicts a table totaling the Army's APU needs: 67 backordered APUs; 118 APUs estimated to meet the Army's needs until the next competitive awardee can produce following FAT; and 25 APUs to support vehicle shortages.  AR at 837.  Considering the Army has been out of stock of APUs since 9 August 2017, and awarding a new competitive contract with FAT would unquestionably take significant production lead time, the Court finds the Army's stated needs reasonable.  The

administrative record demonstrates that the Army has voiced an urgent APU need for over 24 months; the Army's estimates for its urgent APU requirement is a "discretionary determination[] of procurement officials that a court will not second guess." *E.W. Bliss Co.*, 77 F.3d at 449.

The Court finds the 2019 J&A sufficiently documented the steps the Army took to solicit offers from as many potential sources as practicable in accordance with FAR 6.302-2, and the 2019 J&A's factual assertions are well supported in the record.

### C.  Whether Inviting Plaintiff to Submit a FAT Waiver Request was Arbitrary, Capricious, or Otherwise Not in Accordance with Law

Plaintiff argues "[t]he Army violated its duty to ensure that contractors receive 'impartial, fair, and equitable treatment' in the contracting process" by allegedly holding plaintiff to a different FAT standard than Fischer Panda and from the Solicitation. Pl.'s MJAR at 13 (quoting 48 C.F.R. § 1.602-2(b)). Despite the 2019 J&A's discussion of FAT approval, plaintiff notes "the Army issued the Solicitation without a FAT approval requirement." *Id.* at 14. Plaintiff therefore challenges the Army's requirement that plaintiff request a FAT waiver because "unlike [plaintiff], the Army never asked Fischer Panda for a FAT waiver." *Id.* Consequently, plaintiff claims "the FAT requirement appears to have been waived altogether for Fischer Panda resulting in it being held to [a] lower threshold than [plaintiff] to be considered for award." *Id.* Further, plaintiff maintains "if [plaintiff] (the holder of an Army-approved FAT for producing the subject APU's [sic]) is subjected to a FAT Waiver, then Fischer Panda should have had to undergo the FAT Waiver process since it does not hold an Army- approved FAT." *Id.* Lastly, "[t]o the extent an unstated FAT requirement can be somehow inferred from the record . . . the Government must apply the requirement equally among offerors." *Id.* at 15.

The government responds, arguing it was reasonable for the Army to deny plaintiff's FAT waiver request. Def.'s MJAR at 15. The government cites FAR 9.303(b) to argue Army personnel reasonably determined plaintiff would require a new FAT because plaintiff moved its manufacturing facility, one of the circumstances in which FAR 9.303(b) considers it appropriate to require a new FAT. *Id.* at 15–16. Further, "contrary to [plaintiff's] argument that its 2006 FAT approval renders the decision irrational, . . . . nothing in the contract's waiver clause suggests that the Government is required to or should approve a waiver simply because a contractor previously had passed a FAT." *Id.* at 16 (citing FAR 52.209-3(h)). The government also contends the Army's denial of plaintiff's FAT waiver request was reasonable because plaintiff has not produced the APUs in approximately 10 years and the APU specifications have changed nine times since 2009: "the current Hatz APU is not identical to the APU that [plaintiff] produced in the past." *Id.* In response to plaintiff's distinction between its government-issued FAT and Fischer Panda's BAE-issued FAT, the government points out "neither the solicitation nor the J&A required that the FAT be performed by the Government," and the government only required "that the potential contractor already possess an approved FAT or be eligible for a waiver." *Id.* at 11. Lastly, the government explains the Solicitation did not include a FAT requirement "because 'a FAT waiver was not contemplated in the J&A since Fischer Panda has an approved FAT [and] the effect of a FAT waiver is the same as an approved FAT; namely, a new FAT will not be required.'" *Id.* at 13 (quoting AR at 201 n.4 (Combined Contracting Officer's Statement of Facts and Legal Memorandum from GAO protest)).

### 1.   The Army's Denial of Plaintiff's FAT Waiver Request

As previously stated, FAR 9.303(b) provides FAT may be appropriate when a "contractor previously furnished the product to the Government, but— (1) There have been subsequent changes in processes or specifications; [or] (2) Production has been discontinued for an extended period of time."  In addition, FAR 52.209-3(h) provides "[t]he Government may waive the requirement for first article approval test where supplies identical or similar to those called for in the schedule have been previously furnished by the offeror/contractor and have been accepted by the Government.  The offeror/contractor may request a waiver."  The record shows plaintiff "has not produced this part in over 10 years, has not completed a successful FAT on this part in the past 13 years and has had a major change in [its] process, by moving [its] manufacturing location of this part."  AR at 402 ("355 Attributes" document recommending plaintiff's FAT waiver request be denied).  Agency analysis of production history and timing for FAT waiver consideration is a "discretionary determination[] of procurement officials that a court will not second guess."  *E.W. Bliss Co.*, 77 F.3d at 449.  To the extent that plaintiff argues its FAT waiver request was improperly denied, given the amount of time since plaintiff passed FAT approval and produced APUs, the Army's denial of its FAT waiver was a reasonable exercise of the agency's discretion.

### 2.   The Army's Application of Different FAT Standards to Plaintiff and Fischer Panda

Plaintiff also argues the Army violated FAR 1.602-2(b) by holding it to a different FAT standard than Fischer Panda; in other words, the Army treated the two differently by requiring plaintiff to request FAT waiver, but not asking the same of Fischer Panda.  Pl.'s MJAR at 13.  FAR 1.602-2(b) requires a contracting officer to "[e]nsure that contractors receive impartial, fair, and equitable treatment."  This was not a competitive procurement, though; the Solicitation contemplated award solely to Fischer Panda.  The Court is not aware of—and plaintiff does not point to—any provision of law requiring the government to consider plaintiff a potential offeror when it submitted a late proposal in response to the sole source Solicitation.

The record demonstrates part of what caused the urgency of this procurement was Essex's failure to timely pass FAT.  DLA awarded Essex its contract on 1 August 2017, and Essex had twenty months to pass FAT.  Coger Decl. ¶ 5.  The original deadline for Essex to pass FAT was 10 August 2018, which DLA agreed to extend to 29 March 2019.  AR at 837 (unredacted 2019 J&A).  At the time ACC terminated Essex's contract for default, "the FAT was past due by almost nine months."  Coger Decl. ¶ 5.  Since the Army had not received APUs since prior to 2017 and Essex would not be able to produce APUs, the Army's growing and urgent need for APUs only increased.  The Army could not risk further delay by awarding another APU contract to a vendor without the demonstrated technical capability to produce APUs—capability that is demonstrated by a current FAT, which the Army determined plaintiff does not possess.  As explained in the 2019 J&A, "FAT is required to validate prospective contractors have the manufacturing capability, processes, and facilities to produce the APUs [in accordance with] the technical requirements of this procurement."  AR at 837.  Although plaintiff passed FAT in 2006, the APU plaintiff produced in 2006 is not the same APU the Army now requires; the

specifications have since changed. *See* Tr. at 31:6–20. Fischer Panda, on the other hand, passed FAT more recently in January 2018, and is a current supplier of the exact APUs the Army needs. Moreover, the Army afforded plaintiff equal treatment by inviting it to submit documentation showing its technical capability. Plaintiff had the opportunity to respond to the 2019 RFI but did not do so. The Army provided plaintiff with another chance to show its interest and capability by reviewing the August 2019 FAT waiver request. *See* AR at 408 (27 September 2019 letter from CO to plaintiff) ("SSI Technology was invited to submit a First Article Test (FAT) waiver request . . . in an attempt to include SSI Technology in the current action. If the FAT waiver request was approved, [the Solicitation] would have been amended to list SSI Technology as a limited source along with Fischer Panda."). Furthermore, Fischer Panda did not need to request FAT waiver because "the effect of a FAT waiver is the same as an approved FAT; namely, a new FAT will not be required." AR 201 n.4 (Combined Contracting Officer's Statement of Facts and Legal Memorandum from GAO protest). Additionally, the government asserts the FAR does not require FAT approval be conducted by the government as opposed to a private party, which plaintiff does not dispute. Tr. at 34:11–12 ([DOJ Counsel:] "the FAR doesn't require the Government to be the one who does the testing."); 63:25–64:3 ([Plaintiff's Counsel:] "I don't suggest to the Court that a private contractor or private approval process is not permissible. It's clearly permissible. [FAR] 9.307 allows that.").

Accordingly, the Army reasonably concluded "Fischer Panda is the only approved source to have an approved FAT for this requirement." AR at 838 (unredacted 2019 J&A). Requiring current FAT approval or a FAT waiver, which the Army is in the best position to evaluate, is part of the Army's discretion in conducting its procurements, and the Court must afford deference to the Army's exercise of discretion. *See E.W. Bliss Co.*, 77 F.3d at 449 ("[M]inutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess."). The GAO has similarly held that FAT requirements are within the agency's discretion and accorded deference by the reviewing entity. *See Vision Blocks, Inc.*, B-281246, 99-1 CPD ¶ 20 ("An agency's decision to waive a FAT requirement is largely discretionary since the requirement is for the protection and benefit of the government, and our Office will not disturb that decision unless we find it to be unreasonable."). The Court therefore finds the Army acted reasonably in recognizing FAT approval for Fischer Panda and was not arbitrary and capricious in later denying plaintiff waiver of FAT. *See Emery Worldwide Airlines, Inc.*, 264 F.3d at 1086 ("When a party contends that the procurement procedure in a sole-source case involved a violation of a statute, regulation, or procedure, it must establish prejudice by showing that it would have had a substantial chance of receiving the award."). The Army's determination that Fischer Panda's technical capability and FAT approval were better suited for this procurement, rather than plaintiff's outdated Army FAT approval and inexperience with the current APU specification, is a "discretionary determination[] of procurement officials that a court will not second guess." *E.W. Bliss Co.*, 77 F.3d at 449.

### D. Prejudice to Plaintiff by Issuance of a Sole Source Award to Fischer Panda

Lastly, plaintiff argues "the Army's decision to issue a sole source award to Fischer Panda violates federal procurement law causing SSI significant competitive prejudice." Pl.'s MJAR at 17. The urgency of this procurement dates to 2017, when the Army's APU supplier, Minowitz, went out of business. DLA subsequently competitively awarded a contract to Essex, a

new APU vendor, while maintaining an urgent need for APUs. This urgency grew while Essex requested extension of its FAT deadline, ultimately failing to timely pass FAT. By the time the Army terminated Essex's contract because it defaulted on its obligations on 14 May 2019, the Army sustained nearly two years without an APU stock. DLA and ACC personnel worked diligently to find an alternative supplier—Fischer Panda—while mitigating supplier issues. The culmination of these factors led the Army to award a sole source contract to the *only* supplier it knew was approved to produce APUs, an award that was reasonable, and which the Court will not disturb.

"The arbitrary and capricious standard applicable here is highly deferential," and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp.*, 419 U.S. at 285). In the instant bid protest, plaintiff has not demonstrated the Army violated any statute, regulation, or procedure, nor that it was prejudiced by any potential errors in the 2019 J&A. Plaintiff does not hold a current FAT for production of APUs, and the Army has an urgent requirement for the unique specification APUs Fischer Panda demonstrated an ability to produce beginning January 2018. The Court therefore holds the Army's decision to award a sole source contract to Fischer Panda evinces rational reasoning and consideration of all relevant factors. *See Emery Worldwide Airlines, Inc.*, 264 F.3d at 1086 ("Under [the Administrative Procedure Act] standard, the agency's action is entitled to a presumption of regularity, and the agency's action must be upheld as long as a rational basis is articulated and relevant factors are considered.") (internal quotation marks omitted).

### E.   Injunctive Relief

Contemporaneous with filing its complaint, on 23 December 2019, plaintiff filed an application for temporary restraining order and motion for preliminary injunction. *See* Appl. for TRO & Mot. for Prelim. Inj., ECF No. 5. On 2 January 2020, the Court deferred ruling on this motion because the government agreed to voluntarily stay contract award pending resolution of this bid protest. *See* Order, ECF No. 11. In its motion for judgment on the administrative record, plaintiff requested a permanent injunction. *See* Pl.'s MJAR at 19–23. As previously stated, the Court considers the following factors when determining whether to issue a permanent injunction: "(1) whether . . . the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC*, 389 F.3d at 1228–29. Turning first to factor one, plaintiff is not entitled to injunctive relief because plaintiff does not prevail on the merits. The Court therefore does not reach the remaining prongs of the test for a permanent injunction. *Info. Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 357 n.32 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003) ("Absent success on the merits, the other factors are irrelevant.").

## IV.   Conclusion

The Court finds the Army conducted this sole source procurement reasonably and declines plaintiff's invitation to disturb the Army's decision to award a sole source contract to

Fischer Panda.  For the foregoing reasons the Court:  (1) **DENIES** plaintiff's motion for judgment on the administrative record; (2) **GRANTS** the government's cross-motion for judgment on the administrative record; and (3) **DENIES AS MOOT** plaintiff's application for temporary restraining order and motion for preliminary injunction.  The Clerk is directed to enter judgment in accordance with this disposition.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge